273 F.2d 767
 WICKAHONEY SHEEP COMPANY, an Idaho corporation, and Bank of Idaho (formerly Continental State Bank), an Idaho corporation, Appellants,
v.
C. A. SEWELL, Orene H. Sewell and Orville R. Wilson, Appellees.
 No. 16390.
 United States Court of Appeals Ninth Circuit.
 December 11, 1959.
 
 Hawley & Hawley, Jess Hawley, Jr., Elam & Burke, Boise, Idaho, for appellant.
 Langroise & Sullivan, Willis Sullivan, Boise, Idaho, for appellee.
 Before POPE, HAMLEY and HAMLIN, Circuit Judges.
 HAMLIN, Circuit Judge.
 
 
 1
 On December 15, 1955, appellees C. A. Sewell and Orene H. Sewell, as sellers, entered into a Purchase Agreement with appellant Wickahoney Sheep Company, as buyer, for the sale of certain personal property described in the agreement, including 4,087 sheep. The Sewells subsequently assigned their interest to appellee Orville R. Wilson.
 
 
 2
 The total purchase price was $121,700, payable $15,000 down at the time of execution of the agreement, and $15,000 on October 10 of each succeeding year until the purchase price, with interest was paid in full. All the property was delivered to Wickahoney on October 18, 1955, about two months prior to execution of the agreement, and the president of Wickahoney examined all the property prior to taking delivery. The Purchase Agreement and bills of sale were escrowed with appellant Bank of Idaho, to be delivered to Wickahoney upon payment of the full purchase price.
 
 
 3
 The Purchase Agreement provided that in the event of default the sellers should give written notice thereof by mailing notice of default to Wickahoney, upon which Wickahoney would have ninety days in which to remedy any default, but should they fail to do so within that period, the sellers could claim a forfeiture of the agreement and would have the right to retake possession of the property or its replacements and retain all payments as liquidated damages.
 
 
 4
 Wickahoney made the original down payment, but failed to make the payment due on October 10, 1956, and sellers mailed a notice of default which was received by Wickahoney on January 17, 1957. A copy of the notice was sent to the Bank and received by it on January 16, 1957. Wickahoney failed to remedy the default within the 90-day period and the sellers, about two weeks thereafter, filed this action and demanded judgment against Wickahoney for recovery of possession of the property, together with the lambs and increase born of the sheep, or the value thereof. Appellees also sought return of all documents held by the Bank as escrow holder, which documents the Bank deposited with the Court.
 
 
 5
 Appellants are Idaho corporations and appellees are citizens of Nevada. Jurisdiction in the District Court derived from diversity of citizenship and the rights of the parties are governed by State law. 28 U.S.C.A. § 1332; Angel v. Bullington, 1947, 330 U.S. 183, 67 S. Ct. 657, 91 L.Ed. 832.
 
 
 6
 After commencement of this action Wickahoney sold lambs and sheep for a total sales price of $86,082.50, and turned the money over to the Bank to apply on Wickahoney's indebtedness to the Bank. This indebtedness arose out of other transactions which are of no concern on this appeal.
 
 
 7
 On October 9, 1957, the District Court appointed a receiver who took possession of all the assets of Wickahoney, including 1,331 sheep. The receiver liquidated the property, receiving $62,370.18 for that portion of the property subject to the Purchase Agreement. A vehicle worth $1,000 was not accounted for or turned over to the receiver by Wickahoney.
 
 
 8
 Judgment was entered against Wickahoney for $149,452.68, the total of the above amounts, and against the Bank for $86,082.50, the amount derived from the sale of sheep and lambs and turned over to the Bank by Wickahoney. All monies paid by the Bank on the judgment against it were to be applied in partial satisfaction, pro tanto, of the judgment against Wickahoney. The judgment further ordered the clerk of the court to deliver the escrow documents to appellees and to pay to appellees $54,655.04, the balance turned over to the clerk by the receiver after deduction of all receivership costs and expenses, this amount also to be applied in satisfaction of the judgment against Wickahoney.
 
 
 9
 After the notice of default was given, Wickahoney sold wool and pelts from the sheep subject to the Purchase Agreement, and received wool and lamb subsidies, but the District Court did not include these amounts in the judgment and no claim is made therefor.
 
 
 10
 Appellants submit five major points on this appeal. They first contend that no forfeiture of the Purchase Agreement was accomplished, because notice of default was not properly given.
 
 
 11
 The same day the parties executed the Purchase Agreement they entered into an Escrow Agreement, to which the Bank, as escrow holder, was a party. The two agreements specify different procedures for giving notice of default. Under the Purchase Agreement notice of default was to be given directly by the seller to Wickahoney, but under the Escrow Agreement the seller was to deliver two copies of the notice of default to the Bank, with written instructions to the Bank to mail the original to Wickahoney.[1]
 
 
 12
 The only provision in either agreement dealing with possible conflict between them is the following clause in the Escrow Agreement: "It is further agreed that if any part of the escrow agreement and this agreement are in conflict, then the provisions of this agreement shall govern." The ambiguity is apparent. If the term "escrow agreement" is literally read as such, and the term "this agreement" is taken to refer to the agreement in which it is found, the Escrow Agreement, then the provision in effect reads: "* * * if any part of the escrow agreement and the escrow agreement are in conflict, then the provisions of the escrow agreement shall govern." All parties agree that such a meaningless result is to be avoided, but differ as to the proper construction. The theory of appellees is that as the Escrow Agreement is clearly labeled as such, the term "escrow agreement" means just that, and the term "this agreement" must refer to the only other agreement involved, i. e., the Purchase Agreement, with the result that in the event of conflict the Purchase Agreement governs. Appellants, on the other hand, interpret "this agreement" as referring to the agreement in which the term is found, i. e., the Escrow Agreement, and thus the term "escrow agreement" must be taken to mean the agreement put in escrow, the "escrowed agreement," i. e., the Purchase Agreement. Under this construction, the Escrow Agreement would govern in the event of conflict.
 
 
 13
 Even accepting the interpretation advanced by appellants, we do not think appellees' admitted failure to literally comply with the notice provision of the escrow agreement affords appellants grounds for relief from the forfeiture. Appellants admit that appellees complied with the provisions of the Purchase Agreement, but urge that a party seeking to declare a forfeiture must literally comply with the terms of the contract and that the procedure specified in the Escrow Agreement was therefore mandatory.
 
 
 14
 It is true that forfeitures are regarded with disfavor and strict compliance with forfeiture provisions is traditionally required, Stockmen's Supply Co. v. Jenne, 1951, 72 Idaho 57, 237 P.2d 613; Marks v. Strohm, 1944, 65 Idaho 623, 150 P.2d 134; 12 Am.Jur. 1016 (Contracts § 436), but literal compliance in this case would have been a meaningless gesture.
 
 
 15
 The purpose of notice of default in the usual case is to give the party allegedly in default an opportunity to remedy the default and meet his obligator, Bintz Company v. Mueggler, 1944, 65 Idaho 760, 154 P.2d 513, and notice in the prescribed manner is not required where a party has actual notice and has not suffered prejudice. Quinn v. Hartford Accident & Indemnity Co., 71 Idaho 449, 232 P.2d 965. Conceding a somewhat stricter standard is applicable where a forfeiture is sought, we do not think appellees' failure to follow the circuitous procedure of the Escrow Agreement prejudiced appellants. Both Wickahoney and the Bank received notice of default directly from appellees by registered mail and there is no question of the adequacy of the notice itself. To have routed one copy through the Bank would have given Wickahoney nothing more than it received directly.[2]
 
 
 16
 We hold that notice of default was properly given and that appellee's failure to channel the notice of default through the Bank did not preclude their declaring a forfeiture at the expiration of the 90-day period.
 
 
 17
 During July and August of 1957 Wickahoney sold sheep and lambs for $86,082.50, and the property taken over by the receiver in October, 1957, was subsequently sold for $62,370.18. The District Court adopted these amounts and found they represented the fair and reasonable market value of the sheep, lambs and other property at the time of forfeiture of the Purchase Agreement. Appellants assert that the livestock and wool markets fluctuate a great deal, with substantial variations in market quotations over short periods of time. The factor of a fluctuating market is said to make the District Court's findings of value capricious and arbitrary, there being nothing to tie value at the time of the sales in July, August and October to the value at the time of the wrongful taking in April, some months before. Appellants do not question that these amounts represented the fair market value of the property when sold, but claim prejudice in that there is no evidence to sustain the District Court's findings as to the market value of the property at the time of the wrongful taking, which is calculated to be April 17, 1957, ninety days after Wickahoney's receipt of notice of default.
 
 
 18
 The parties agree that in an action of claim and delivery the general rule in Idaho is that property is to be valued as of the time of taking. Tannahill v. Lydon, 31 Idaho 608, 173 P. 1146; Unfried v. Libert, 20 Idaho 708, 119 P. 885; Cornwall v. Mix, 3 Idaho 687, 34 P. 893. Appellees, however, submit that jurisdictions, such as Idaho, which accept market value at time of wrongful taking as the proper measure recognize an exception and allow the prevailing party a higher value where an enhanced price is realized or could have been realized within a reasonable time after taking. 46 Am.Jur. 80 (Replevin § 148); 77 C.J.S. Replevin § 270, p. 194. It does not appear that the courts of Idaho have been called upon to pass on this question, but there is good reason for adopting this "exception" in this case.
 
 
 19
 C. A. Sewell, one of the sellers, testified that he had run the sheep company for some years prior to the sale to Wickahoney, and that winter lambs "stayed on their mother" until shipment, which began around the first of July. Had Wickahoney returned the sheep to appellees after the forfeiture was declared, appellees could have sold the lambs at the usual market time and realized the same price as Wickahoney. To allow appellants the benefit of any lower price would be in effect to award them profits which but for their wrongful withholding would have gone to appellees.
 
 
 20
 Although this point has substantial merit, we think it enough to say that as appellees introduced evidence of value at the time of sale, which appellants must have known was offered to establish the amounts to which appellees were entitled, it was incumbent on appellants, if they wished to claim a lower value, either to have made a showing on which a finding of lower value could have been predicated or to have objected to any evidence of value as of a time other than the time of taking. Appellants neither objected nor offered any contrary evidence of value and consequently we find no prejudice.
 
 
 21
 It may be noted in this connection that Wickahoney failed and refused to turn over or to account to the receiver for a vehicle being sold under the Purchase Agreement. Sewell was asked by his counsel if he had any opinion as to the fair market value of the truck, whereupon appellant's counsel stated: "I will object unless he fixes a time." It is thus apparent that appellants were alert to the relevance of time of valuation, and if they felt they were prejudiced by admission of evidence of value of the other property as of the time of its sale, they could have interposed a like objection. This they failed to do.
 
 
 22
 Appellants' third principal point is that appellees were in default under the Purchase Agreement and thus not entitled to declare a forfeiture. On December 15, 1955, the same day the parties entered into the Purchase Agreement, they entered into a Modification of Lease, which recited that prior thereto, on October 18, 1955, the Sewells as lessors and Wickahoney as lessee executed a lease covering certain real and personal property, and it was the desire of the parties to enter into a corrected and modified lease. Under the Modification of Lease the Sewells leased to Wickahoney the "Coig Property," including all grazing rights the Sewells held under the Taylor Grazing Act by virtue of ownership of any of the property.
 
 
 23
 A Memorandum Agreement entered into between the Sewells and Wickahoney on October 19, 1955, refers to a Lease and Option entered into the same day. The Lease and Option referred to in this Memorandum Agreement is apparently the same document referred to in the Modification of Lease executed December 15, 1955. The Memorandum Agreement recites:
 
 
 24
 "Whereas it is contemplated by the parties that additional grazing rights shall be transferred from Sewells to Wickahoney, said grazing rights to be in addition to those covered by said Lease and Option;
 
 
 25
 "Now Therefore * * * it is agreed:
 
 
 26
 "1. Sewells agree to lease to Wickahoney, Taylor grazing rights of not less than eight hundred (800) A.U.M.'s for a period of ten (10) years, and simultaneously with the execution of said lease, to grant to Wickahoney an option to purchase not only said grazing rights, but sufficient deeded lands to comply with the requirements of the United States Grazing Service. Said lands to be adjacent and accessible to the "Coig property".
 
 
 27
 "2. Said Lease and Option agreements shall be made and entered into as soon after the execution of this Memorandum Agreement as the necessary information can be obtained as to the acreage involved and the numbers of the grazing rights * * *"
 
 
 28
 The land to be leased and optioned to Wickahoney, and the price to be paid for the land and grazing rights was to be established by a range management expert, Harley McDowell. McDowell made his survey and appraisal and conveyed his findings to the parties by a letter dated November 23, 1955, in which he recommended lands known as the Nit Creek lands be set aside for Wickahoney pursuant to the provisions of the Memorandum Agreement.
 
 
 29
 Appellants claim that the Purchase Agreement, Modification of Lease and Memorandum Agreement disclose an integrated transaction, the Purchase Agreement relating to the sheep and other personal property, and the latter two agreements relating to the land upon which the sheep "spread" would be maintained. Appellants admit the Sewells transferred the Taylor Grazing Rights, but contend they refused to sell or lease the Nit Creek lands which had been selected by McDowell. They say that the Coig Property lands covered by the Modification of Lease were insufficient to carry the sheep, that compliance by the Sewells with the agreement to sell additional grazing rights and land was necessary to sustain Wickahoney's operation, and conclude that as appellees themselves were in default with respect to the Nit Creek lands they could not declare a forfeiture. Huggins v. Green Top Dairy Farms, Inc., 75 Idaho 436, 273 P.2d 399; Giffen v. Faulkner, 50 Idaho 190, 294 P. 521.
 
 
 30
 Assuming, arguendo, the three documents referred to relate to a single transaction and must be read together, we do not think appellees are chargeable with any default. One of the attorneys for Wickahoney prepared a Lease and Option covering the Nit Creek land and submitted them to appellees in the latter part of September, 1956, about ten months after McDowell's report. On October 5, 1956, appellees' attorney acknowledged receipt of the documents and stated that he and Sewell found the principle of the transaction as outlined in the Lease and Option was according to the agreement of the parties, but that he wished to raise one technical point involving the grazing rights. He concluded:
 
 
 31
 "I don't think we have any major problem, but I wish to be sure that we are in common agreement as to mechanics of the transfer of grazing rights.
 
 
 32
 "You, undoubtedly, know that Charlie [Sewell] sold his Idaho Blue Creek Ranch, but the Nit Creek property and the grazing rights to be transferred to you were reserved from the transaction.
 
 
 33
 "As soon as you and I can exchange views about how to handle the movement of grazing rights, we shall forward the instruments for signature."
 
 
 34
 Five days after this letter was sent Wickahoney was in default in failing to meet the annual installment on the purchase price, and it does not appear that there was any further communication regarding the Nit Creek lands. Appellants do not claim that appellees should have taken the initiative in preparing the lease, and it appears that appellees acted promptly and in good faith and did all that reasonably was required of them. Wickahoney's failure to take any action with respect to leasing the Nit Creek lands until almost a year after the sheep were turned over indicates the need for a formal lease was not as pressing as is now claimed. Appellants pleaded a defense of fraud and misrepresentation, but did not plead breach of contract. That appellants at the trial did not rely on any claim of breach of contract is apparent from counsel's comment after he had stated the substance of the agreement concerning the additional lands and that there had been a partial performance by appellees:
 
 
 35
 "The Court: Assuming that that is true, does that give you a basis for an action for fraud and misrepresentation, or breach of contract?
 
 
 36
 "Mr. Hawley [Wickahoney's counsel]: I think fraud and misrepresentation."
 
 
 37
 Even assuming the Sewells may have had some affirmative obligation to initiate action looking to leasing the Nit Creek lands, Wickahoney was not prejudiced as it had the use of the land during the period in question. As the president of Wickahoney testified, with directness and cogency not easily matched, "We don't have to lease it cause we got it."
 
 
 38
 Appellants next contend Wickahoney is entitled to an offset for the expense of care and maintenance of the sheep and the expenses of the operation of the company. No claim for any such offset was raised in the pleadings, but "When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings. * * *" Federal Rule of Civil Procedure 15(b), 28 U.S.C.A. Appellants introduced Statements of Income and Expense for the periods October 18, 1955, to September 30, 1956, and October 1, 1956, to October 8, 1957. These Statements were prepared by Wickahoney's bookkeeper and show, for the respective periods, the totals of broad categories of expenses, such as feed, salaries, freight and so on. Appellees introduced a Statement of Income and Expense for the period January 1, 1956 to October 31, 1956. This is a copy of a statement furnished appellees by the Bank and contains some of the information included in the statements introduced by appellants. This statement was apparently acquired by the Bank in connection with loans the Bank made to Wickahoney, and was introduced by appellees in connection with these loans and various chattel mortgages executed by Wickahoney in favor of the Bank. The loans and mortgages are of no concern on this appeal.
 
 
 39
 Appellants have not attempted to show which of the various categories of expenses, totalling more than $225,000, are thought to be attributable to maintaining the particular property for the value of which appellees were given judgment. Nor have appellants indicated the periods for which they claim they should be allowed an offset. Taking an item at random, the Statement for the period October 1, 1956, to October 8, 1957, shows an expense of $5,095.20 for "Maintenance and Repairs." There is nothing to show whether this money was spent on property being sold under the Purchase Agreement or on other property belonging to Wickahoney. Neither is it shown when the money was spent nor what relation the expenditures making up the total have to caring for and maintaining the lambs or other property.
 
 
 40
 In 1956 Wickahoney sold sheep, lambs, wool and pelts, and in 1957 sold wool and pelts and received a wool subsidy, receiving more than $130,000 therefor. Appellees were not given judgment for any of these amounts. It appears that Wickahoney received the full benefit of many of the expenses, such as the cost of shearing the sheep, as they were allowed to keep all the income from the sale of wool. Appellants failed to establish the relation of other items of expense to any portion of the judgment.
 
 
 41
 When appellants offered the Statements, the trial Court commented he did not "see the materiality at the moment," but would admit them for what they were worth. After the trial appellants asked for "a credit against the purchase price of $86,082.50, received by defendant Wickahoney Sheep Company and transmitted to defendant Bank of Idaho, for the necessary and proper expenses incurred by defendant Wickahoney Sheep Company in caring for and operating the sheep. * * *", but they apparently offered nothing at the trial to indicate the purpose for which the Statements were submitted.
 
 
 42
 We do not think mere introduction of the Statements was sufficient to constitute a trial on the issue of set-off "by express or implied consent of the parties," and for the reasons indicated we think the Statements are wholly inadequate as proof of the claimed set-off, assuming that even if established the items could be allowed, which is questionable. Cunningham v. Stoner, 1904, 10 Idaho 549, 79 P. 228.
 
 
 43
 Lastly, appellants suggest that Wickahoney, as conditional vendee under the Purchase Agreement, received the essential incidents of the property along with possession, and had implied authority to sell the lambs and wool resulting from the band of sheep, Coffin v. Northwestern Mutual Fire Association, 43 Idaho 1, 249 P. 89, 48 A.L.R. 1225, and contend that appellees were title holders for security purposes only, and should be limited to the balance due on the contract. Appellees were given judgment for $149,452.68. The balance due on the contract was $106,700, plus interest.
 
 
 44
 A factual situation in many respects similar to the one here was presented in Casper v. Spaulding, 1956, 78 Idaho 282, 301 P.2d 1097, except that there the seller sued for and recovered the balance due on a conditional sales contract, whereas here the seller sued for possession or value of the property being sold. As appellants interpret the case, the proper measure of damages here is the balance due on the conditional sales agreement, rather than the fair market value of the property. Appellees submit the case stands simply for the proposition that on default by a conditional vendee, the vendor is entitled, at his election, to either (1) sue for the balance of the purchase price, as was done in Casper, or (2) bring an action in claim and delivery to recover the property being sold, or its value, as appellees did here. Appellees point out that the text in 47 Am.Jur. 102 (Sales §§ 893, 894), cited in Casper, supports this interpretation. We agree, and think that appellees had the right to bring an action in claim and delivery, which entitled them to possession of the property, or, as delivery could not be had, to its value. Largilliere Co., Bankers v. Kunz, 41 Idaho 767, 244 P. 404; Tannahill v. Lydon, 31 Idaho 608, 173 P. 1146; Bates v. Capital State Bank, 21 Idaho 141, 121 P. 561; Oakes v. Lake, 1933, 290 U.S. 59, 54 S.Ct. 13, 78 L.Ed. 168. It is admitted the increase of the sheep belongs to the owner of the mother. Arkansas Valley Land & Cattle Company v. Mann, 1889, 130 U.S. 69, 9 S.Ct. 458, 32 L.Ed. 854; 2 Am.Jur. 703 (Animals § 15); 3 C.J.S. Animals § 7, p. 1090; see Cunningham v. Stoner, supra.
 
 
 45
 We find all of the contentions of appellants without merit. The judgment is affirmed.
 
 
 
 Notes:
 
 
 [1]
 The Purchase Agreement provided:
 "* * * should Purchaser be in default in any of the terms or conditions of this agreement, Sellers shall give Purchaser notice of such claimed default in writing, * * * to be sent by registered or certified mail, postage prepaid, return receipt requested, and thereafter Purchaser shall have ninety (90) days within which to remedy the claimed default. Should the Purchaser fully perform those matters claimed to be in default as set out in said notice within said ninety-day period, no forfeiture may be declared or shall become effective. However, in the event that Purchaser fails to remedy the claimed default within the ninety-day period, Seller may claim a forfeiture of this agreement and shall have the right to retake possession of the personal property herein described, or its replacements, and the Sellers may retain all payments made hereunder as liquidated damages."
 The Escrow Agreement provided:
 "* * * in the event the Seller shall declare a default, he shall deliver to the bank as Escrow Holder, Notification of Default, in duplicate, with written instructions to the Escrow Holder to mail the original to the Purchaser by United States Registered Mail. In case the delinquent payment or payments or other causes of default shall not be made or corrected as specified in the Notification of Default within a period of thirty days from the date of mailing of the Notice of Default to the Purchaser then all documents shall be returned to the Grantors. * * * All notices given pursuant to the terms of any agreement placed in escrow herewith must be given through the Escrow Holder as hereinbefore provided, and said Escrow Holder shall not be required to recognize service of notice given in any other manner. The duplicate notice shall be retained with the escrow file. * * *
 "It is further agreed that if any part of the escrow agreement and this agreement are in conflict, then the provisions of this agreement shall govern. * * *"
 
 
 [2]
 Although not necessary to our conclusion, two additional points advanced by appellees may be summarized. First, the Purchase Agreement provided, and Wickahoney was allowed, a 90-day period in which to remedy default, whereas the Escrow Agreement provided only a 30-day period. Wickahoney was thus given triple the time they would have been allowed had the terms of the Escrow Agreement been rigorously followed. Second, the Escrow Agreement provides merely that the escrow holder shall not be required to recognize service of notice given in a manner other than that specified therein. The Escrow Agreement consists of a form provided by the Bank, the escrow holder, and appellees argue that the notice provision was inserted by the Bank for its own benefit, and does not purport to bind the parties to the Purchase Agreement or alter their rights or obligations thereunder